# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

Bankruptcy Judge Elizabeth E. Brown

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JOHN GLENN POPOVICH, | ) | Bankruptcy Case No. 03-33765 EEB |
| f/d/b/a JP ERECTORS, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| TRUSTEES OF THE COLORADO | ) | |
| IRONWORKERS PENSION FUND, | ) | |
| TRUSTEES OF THE COLORADO | ) | |
| STATEWIDE IRON WORKERS (ERECTOR) | ) | |
| JOINT APPRENTICESHIP AND TRAINING | ) | |
| FUND, TRUSTEES OF THE | ) | |
| IRONWORKERS WELFARE PLAN OF | ) | |
| COLORADO, AND TRUSTEES OF | ) | |
| COLORADO IRON WORKERS ANNUITY | ) | |
| TRUST FUND, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 04-1036 EEB |
| | ) | |
| JOHN GLENN POPOVICH, | ) | |
| | ) | |
| | ) | |
|     Defendant. | ) | |

**APPEARANCES:**

Dean Heizer
Miranda K. Hawkins
COUNSEL FOR THE PLAINTIFF
2401 15th St., Suite 300
Denver, CO 80202

Stephen H. Swift
COUNSEL FOR THE DEFENDANT
733 E. Costilla, Suite A & B
Colorado Springs, CO 80903

_____

## ORDER
_____

THIS MATTER comes before the Court on Plaintiffs' Complaint, objecting to the dischargeability of the debt owed to Plaintiffs by the Defendant ("Debtor"), under 11 U.S.C. § 523(a)(4), which debt arose from his company's non-payment of certain employee benefits owed under a collective bargaining agreement. By agreement of the parties, the Court bifurcated the issues of liability and damages and has tried the issue of liability only. Based on the evidence presented at trial and the arguments of counsel, the Court hereby FINDS and CONCLUDES as follows:

**BACKGROUND**

JP Erectors, LLC ("JP Erectors") began its operations in the structural steel business in January of 2000. When it sought to employ members of the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers, Local No. 24 (the "Union"), JP Erectors was required to execute a Compliance Agreement, agreeing to abide by the terms and conditions of the collective bargaining agreement (the "CBA") between the Colorado Steel Erectors Association and the Union. The CBA required JP Erectors to report and pay fringe benefit contributions on the basis of each hour worked by each Union member employee who performed any work of the type that is covered by the CBA.

Article 12 of the CBA provides that the "wage rates" for all covered employees "shall include other monetary items such as" the fringe benefit contributions at issue in this case. Addendum "A" to the CBA lists "wage rates" for different categories of employees for both commercial and industrial jobs. The wage rates appear in a table. For example, the wage rate table for a journeyman on a commercial job appears as:

| Wages | H&W | Pen. | Annu. | Appren. | III | LMC | CAF | Total |
|---|---|---|---|---|---|---|---|---|
| 19.75 | 1.85 | 2.00 | .85 | .50 | .01 | .08 | .03 | 25.07 |

JP Erectors was obligated to make payments of the fringe benefit contributions to the Colorado Ironworkers Pension Fund, the Colorado Statewide Iron Workers (Erector) Joint Apprenticeship and Training Fund, the Ironworkers Welfare Plan of Colorado, and the Colorado Iron Workers Annuity Trust Fund (referred to collectively as "the Trust Funds"). Plaintiffs are the trustees of the Trust Funds and are referred to collectively as the "Trustees."

2

The agreements governing the Trust Funds (the "Trust Agreements") provide that the fringe benefit contributions are to be paid monthly and are to be accompanied by monthly reporting forms, showing the hours worked by covered employees during the month. According to Article 10 of the CBA, employees are to be paid once a week, in cash, company check, electronic funds transfer, or other legal tender. The CBA requires that a separate statement accompany each payment of wages showing the "total earnings, the total hours, the amount of each taxable deduction, the purpose thereof, and net earnings."

In August of 2000, JP Erectors began experiencing financial difficulties, due primarily to a dispute over one large construction project. When JP Erectors was unable to meet its payroll and other necessary expenses, the Debtor, as the sole owner and manager of JP Erectors, obtained loans from friends and family members and took out a second mortgage on his home. The additional financing, however, was insufficient to meet payroll and other necessary expenses.

For the months of September 2000 through December 2000, JP Erectors continued to submit reports to the Trustees, showing the amounts owed, but it did not actually remit any of the contributions owed during this time period. The only deductions shown on the employee paychecks were deductions for Medicare, FICA, and state and federal taxes.

## ANALYSIS

The Trustees seek a determination that the Debtor is personally liable for the failure of JP Erectors to pay the unpaid fringe benefit contributions and that the debt is nondischargeable under 11 U.S.C. § 523(a)(4), as an act of defalcation committed by the Debtor while acting in a fiduciary capacity. To satisfy the requirements of this statute, the Trustees must prove: (1) the existence of a technical trust; (2) that the Debtor owed a fiduciary duty arising from the trust; and (3) that the debtor breached the fiduciary duty by defalcation. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371-72 (10th Cir. 1996).

The Trustees contend that applicable provisions of ERISA, 29 U.S.C. §§ 1001-1461, create a statutory or technical trust sufficient to meet the requirements of Section 523(a)(4). They further assert that the Debtor was a fiduciary. 29 U.S.C. § 1002(21)(A) provides, in relevant part, that a "person is a fiduciary with respect to a plan," and therefore subject to ERISA fiduciary duties, "to the extent" that he or she "exercises any authority or control respecting management or disposition of [plan] assets . . . ." Since the Debtor was the sole owner and managing member of JP Erectors, as well as a signatory on its bank account, the Trustees argue that he is a fiduciary under ERISA. Finally, they allege that his failure to pay fringe benefit contributions to the Trust Funds, while using the funds of JP Erectors to pay other business expenses and some personal expenses, constitutes a defalcation.

The Tenth Circuit has recently addressed Section 523(a)(4) and its relationship to ERISA in the case of *Navarre v. Luna (In re Luna)*, 406 F.3d 1192 (10th Cir. 2005). The facts of *Luna* are strikingly similar to this case. The Lunas were owners of a construction company that employed workers represented by the ironworkers' union in Oklahoma, subject to the provisions of a collective bargaining agreement that required employers to submit monthly employer

contributions for fringe benefits. These contributions were not withheld from employees' wages. When the business began to fail, the Lunas also sought loans to keep the business afloat and contributed some of their own funds. Nevertheless, they did not make the required monthly fringe benefit contributions. The Lunas used corporate funds to pay some of their personal expenses during this time of financial distress. Ultimately, they dissolved the corporation and filed personal bankruptcies. The trustees of the employee benefit trust funds filed an adversary proceeding to obtain a determination that the Lunas were personally liable and that the debt was nondischargeable under Section 523(a)(4).

In *Luna,* the Tenth Circuit held that to succeed on their claim of nondischargeability, the trustees would have to show that the Lunas acted as fiduciaries under Section 523(a)(4). *Id.* at 1198. While declining to decide the question of whether fiduciary status under ERISA would satisfy the fiduciary requirement under Section 523(a)(4), the Tenth Circuit determined that the Lunas were not fiduciaries under the ERISA definition. *Id.* at 1198 and 1201. The Court first found that the unpaid contributions were not plan assets. The contractual right to collect the contributions was a plan asset. *Id.* at 1200. It then reasoned that the trustees, not the Lunas, were the persons who exercised control over the management or disposition of the contract right. Thus, the trustees were the fiduciaries under the ERISA definition. *Id.* at 1202. The Court specifically rejected the argument that the Lunas' decisions to use limited corporate funds to pay other business and personal expenses, rather than making the contributions to the trust funds, meant that the Lunas had exercised any control or authority over plan assets. *Id.* at 1207.    The Tenth Circuit held that the Lunas' contractual obligation to make monthly fringe benefit contributions to the trust funds did not elevate the debtor-creditor relationship between the Lunas and the trust funds to a fiduciary relationship. As a result, the Lunas' debt to the trust funds was dischargeable. *Id.* at 1205.

Despite the extraordinary similarity of the facts in this case to the facts of *Luna,* the Trustees have argued that this case is not governed by *Luna.* They attempt to distinguish *Luna* on the basis that the contributions at issue in this case were "employee contributions" not "employer contributions." This distinction is significant because, in *dicta,* the Tenth Circuit stated that an employer who failed to pay employee contributions to an ERISA trust fund would be a fiduciary under the terms of ERISA.

A discussion of the contrast between employee and employer contributions is found in three distinct places in the *Luna* decision. First, in footnote 3, the court stated that a Department of Labor regulation defining "plan assets" was not applicable to determine whether the unpaid fringe benefit contributions were plan assets because "it addresses *employee* contributions, not *employer* contributions." *Id.* at 1199 n.3 (emphasis in original). Next, in footnote 11, the court cited the Restatement (Third) of Trusts § 5, comment k., in support of its conclusion that the Lunas were debtors to the plans rather than fiduciaries. This section of the Restatement of Trusts discusses a trust arising as to amounts deducted from employees' wages by an employer. The Tenth Circuit concluded that, "a trust arises only when an employer actually deducts and sets aside amounts from an employee's salary. In [*Luna*], however, the Lunas never deducted amounts from their employees' wages." *Id.* at 1206 n.11. Finally, in footnote 13, the court distinguished the situation where employers fail to pay contributions owed to a plan from "the situation where an

4

employer has control over funds that were withheld from employees' pay checks." *Id.* n.13. The court stated that, "[w]here the issue is not *employer* contributions (as here), but rather *employee* contributions held by the employer, courts will recognize that the employer meets ERISA's statutory definition of a fiduciary." *Id.* (emphasis in original).

The Trustees argue that the unpaid fringe benefits in this case are employee contributions based, in part, on the language of the CBA. The Trustees cite Article 12 of the CBA and Exhibit "A" in support of their assertion that an employee's wage consists of a net wage, which appears on the paycheck, and a fringe benefit component, which is "withheld from the total wage" and remitted to the Trustees. In their interpretation of the various wage rates shown on Exhibit "A," the Trustees contend that the journeyman's "wage," for example, is $25.07 per hour, of which $5.32 is "deducted" by the employer for the various fringe benefits resulting in a "net wage," shown on the paycheck, of $19.75. This is contrary to the explicit terms of Exhibit "A," which lists the "wage" component as $19.75.

The Trustees also argue that the "common law of the shop" compels the conclusion that the fringe benefit contributions are employees' funds that are withheld by the employer. In support of this argument, the Trustees rely on the testimony of Mr. Arp, a union representative, and Ms. Boyd, an employer, both of whom participated in the negotiation of the CBA. Both testified that they believed the fringe benefits were "the employee's money" as soon as the employee had worked an hour of covered employment. The Court, however, finds this testimony to be too scripted and obviously tailored to the language of the *Luna* decision to have much persuasive effect.

A more reasonable interpretation of Exhibit "A" is actually the reverse of what the Trustees have argued. The table is logically read from left to right, starting with the "wage" of the employee, and then *adding in* the various amounts to be contributed by the employer for fringe benefits, resulting in a "total" wage and benefit package in the final, right-hand column. The Trustees' argument requires one to start at the right-hand side of the page with a total wage, then move left *subtracting* each "deduction." The Court notes that the collective bargaining agreement in *Luna* contained an almost identical table of wages and fringe benefits. As set forth in the decision of the Bankruptcy Court, the wage table in *Luna* was:

| Wage | H&W | Local Appr. | National Appr. | Pension Cont. | Direct Contr. | Total |
|---|---|---|---|---|---|---|
| $16.00 | $2.70 | $.30 | $.02 | $1.65 | $1.30 | $21.97 |

Decision of Bankruptcy Court at *12, Attachment 2 to the Appellants' Appendix in *Luna*.

This Court recognizes that, in contract negotiations, a union must focus on the total package of wages and benefits in analyzing the economic benefits to be realized by its members. Indeed, any employee considering a job offer would take into account the value of any benefits offered by the employer in addition to the salary or wage. However, for purposes of applying the ERISA definition of "fiduciary," under the precedent in this Circuit, the fact that benefits are part of the "wage package" does not make them the employees' funds.

5

Furthermore, the language of the CBA and the Trust Agreements, both of which were drafted well in advance of the *Luna* case, are instructive.  The language of the CBA provides that some of the components of the table are "contributions," such as those at issue in this case, and some are "deductions," such as the payment to the Institute of Ironworking Industry.  However, with respect to the contributions to the Trust Funds, the CBA and the Trust Agreements consistently recognize that these are amounts "contributed" by employers.  Articles 16, 17, and 18 of the CBA state that the employer "shall contribute the appropriate amount" for each hour worked by a covered employee.  This language is in stark contrast to the language of Articles 19, 20, and 21 of the CBA, which provide that the "employer agrees to deduct" from "wages" or from "weekly pay" amounts to be forwarded to the Institute of Iron Working Industry, union assessments and the political action fund.

As a result, the Court concludes that the term "wage rates," as used in Article 12 of the CBA, encompasses the total of the wages plus the fringe benefit package.  The fringe benefit contributions at issue in this case are "employer contributions" as that term is used in the *Luna* case.  The terms "wages" and "weekly pay" used in Articles 10, 19, 20, and 21 of the CBA refer to the employee's paycheck or "employee funds" as that concept is described in *Luna.*  The contributions to the Trust Funds were not deducted from the employee's wages according to the plain language of Articles 16, 17, and 18 of the CBA and this Court's interpretation of Exhibit "A."  This conclusion is also supported by the testimony of the Debtor to the effect that the only deductions shown on employees' paychecks were for Medicare, FICA, and state and federal taxes.

In *Luna*, the Tenth Circuit also analyzed the default provisions of the collective bargaining agreement in order to determine whether the trustees' claim was a claim to property held in trust by the employer or was a claim for damages for breach of contract.  The Court concluded that the language of the agreement demonstrated that a default was a breach of contract, not a conversion of the trustees' property.  In footnote 12 of the *Luna* decision, the Court noted that the agreement, "specifically contemplates that the Lunas' failure to make contributions would give rise to a contractual claim.  It provides that the Lunas, in the event of breach, are responsible for liquidated damages, costs of collection, attorney's fees, and audit fees."  *Luna,* 406 F.3d at 1206 n.12.  The CBA in this case is nearly identical, providing, in Article 22, that if the employer "becomes delinquent in making the required payments" to the Trust Funds, the employer will be liable for the required payments and all "assessments, liquidated damages, interest, expenses of collection, court costs, and/or attorney's fees arising from or relating to any such delinquency . . . ."

The language of the Trust Agreements further supports the conclusion that the contributions at issue were employer contributions as that term is used in *Luna.*  In Article I, paragraph 7, of each of the Trust Agreements, "[c]ontributions" are defined as the "amount of dollars that shall be *contributed* to the Fund by an Employer at the rate per hour worked . . . ." (emphasis added).  Article IV, paragraph 1 of each of the Trust Agreements is entitled "Contributions" and provides that "each Employer shall *pay to* the Fund such amounts as are set forth in the [CBA] . . . ." (emphasis added).  This language contemplates that the contributions at issue are to be *paid* or *contributed* by the employers from the employers' own funds.  If the Trust Agreements viewed the contributions as employees' funds, one would expect to see language to the effect that the contributions should be *forwarded to* the Trust Funds or that they were held by

the employers *on behalf of the employees.* There is no such language in the Trust Agreements.

Other courts addressing the issue of whether employers are fiduciaries under ERISA have also focused on whether the unpaid contributions were deducted from the employee's paychecks. For example, in *Phelps v. C.T. Enterprises, Inc.*, 394 F.3d 213 (4th Cir. 2005), the employer maintained a health benefits plan, funded by both employer and employee contributions. The employee contributions were "made by payroll deductions" of different amounts depending upon the level of coverage elected by the employee. The Fourth Circuit held that the employer was a fiduciary under ERISA because it was entrusted with employee funds as well as being obligated to make employer contributions. The *Phelps* court repeatedly used the terms "deducted from paychecks," "withheld from employees," and "paycheck contributions" when discussing whether the employer had violated its fiduciary duties under ERISA. The decision never mentions the possibility of a breach of fiduciary duty in connection with the failure to pay the employer contributions to the plan.

In *Professional Helicopter Pilots Ass'n v. Denison*, 804 F.Supp. 1447 (M.D. Ala. 1992), the employer funded its ERISA pension plan with amounts withheld from employees' wages in an amount designated by each employee as his contribution to the plan *and* amounts deposited by the employer under an agreement that it would deposit an amount equal to 1.5% of each employee's base salary. The court held that the failure to make the employer contributions to the plan did not breach any fiduciary obligation under ERISA. However, once the employees' contributions were deducted from their paychecks, the employer breached its fiduciary duty by failing to segregate these contributions and pay them over to the pension fund.

The determining factor before each of these courts, including *Luna*, is whether the contributions are deducted from the employee's paycheck. This is true despite the fact that paycheck deductions may be only an accounting entry not involving the actual transfer of any funds. *See Phelps*, 394 F.3d at 220. For ERISA purposes, at least in this Circuit, the Tenth Circuit has rejected the reasoning of cases that hold that the failure to pay contractually-owed employer contributions to an ERISA plan is sufficient to establish a breach of ERISA's fiduciary duties. *See Luna,* 406 F.3d at 1206-07. A critical distinction is made between funds withheld or deducted from employees' paychecks and funds that an employer is contractually obligated to pay to an ERISA plan.

This distinction is not merely one of form over substance. In both the *Phelps* and *Denison* cases, the employees had discretion whether, and in what amount, to make contributions to the ERISA plans out of their taxable income. In such cases, it makes sense to treat the contribution as being owned by the employee and held in trust by the employer. Even in a case where the employee has no discretion as to how much or whether to contribute to an ERISA plan, when the contribution is shown on a paycheck stub as a deduction from the employee's taxable income, there is a clear precedent for treating the contribution as the employee's property. *See United States v. Grizzle*, 933 F.2d 943 (11th Cir. 1991) (vacation fund comprised of $1.00 per hour withheld from each employee's after- tax income was made up of employee contributions, thus employer was a "de facto" ERISA fiduciary).

7

The requirement that employee contributions be withheld or deducted from paychecks is very strongly emphasized in *Luna.* As noted above, the decision has three separate footnotes suggesting that a fiduciary relationship might have been found had the contributions been deducted from the employees' paychecks. Moreover, *Luna* is emphatic and definite in its holding that where the employer's funds are involved, the employer's decision to use those funds to pay other business or personal expenses rather than to make contractually-owed contributions to an ERISA trust fund is "a business decision, not a breach of fiduciary duty." *Luna,* 406 F. 3d at 1207.

**CONCLUSION**

This Court is bound to follow the *Luna* precedent, and is unable to find in the CBA, the Trust Agreement, or the other evidence presented at trial, any distinction between the contributions at issue in *Luna* and the contributions that JP Erectors failed to make. Having rejected the Trustees' argument that the contributions were deductions from the employees' wages, the Court has no other choice but to find that they were "employer contributions" and that the failure to make the required contributions to the fund was a breach of the CBA, but not a breach of any fiduciary duty. As in *Luna*, JP Erectors' and the Debtor's relationship to the Trust funds was that of "debtor/creditor, rather than fiduciary." *Id.* at 1206.

The Trustees have failed to show that the Debtor had a fiduciary relationship with respect to a plan asset, and have therefore failed to establish one of the required elements of nondischargeability under Section 523(a)(4).

Based upon the foregoing, the Court finds and orders as follows:

    a. The Debtor's debt to the Trustees is dischargeable under 11 U.S.C. § 727(a) and (b).

    b. Judgment shall enter in favor of the Debtor and against the Trustees on all of the claims for relief set forth in the Trustees' Complaint.

DATED this 15th day of August, 2006.

BY THE COURT:

_____
Elizabeth E. Brown,
United States Bankruptcy Judge